UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA      :   Hon. Jerome B. Simandle
                              :
     v.                       :
                              :
WILLIAM BROWN,                :
WILLIAM HERNANDEZ,            :
  a/k/a "William Moreno,"     :
LAWRENCE JOHNSON,             :
  a/k/a "Marv," and           :
RASHEEN MINES,                :
  a/k/a "Sheen"               :   Crim. No. 06-126 (JBS)

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR ADMISSION OF EVIDENCE**

The government submits this Memorandum of Law in Support of Motion for Admission of Evidence, seeking the admission of certain evidence (described herein) at the trial of this case. By filing this motion, the government: (1) meets its pre-trial disclosure obligations under Federal Rule of Evidence 404(b); and (2) seeks a pretrial ruling from the Court to inform all parties whether and to what extent this evidence will be admitted at trial.

**I.   The Indictment**

The grand jury has returned an eight-count indictment (hereafter the "Indictment") charging defendants William Brown, William Hernandez, a/k/a "William Moreno," Lawrence Johnson, a/k/a "Marv," and Rasheen Mines, a/k/a "Sheen" (hereafter the "defendants") as follows:

**Count 1:**  Charging the defendants with conspiring and agreeing to commit robbery in violation of the Hobbs Act, Title 18 U.S.C. § 1951;

**Count 2:**  Charging the defendants with a substantive violation of the Hobbs Act;

**Count 3:**  Charging the defendants with the use of firearms in furtherance of Counts 1 and 2, in violation of Title 18 U.S.C. § 924(c);

**Count 4:**  Charging defendant Brown with being a felon in possession, in violation of Title 18 U.S.C. § 922(g);

**Count 5:**  Charging defendant Hernandez with being a felon in possession, in violation of Title 18 U.S.C. § 922(g);

**Count 6:**  Charging defendant Johnson with being a felon in possession, in violation of Title 18 U.S.C. § 922(g);

**Count 7:**  Charging defendant Mines with being a felon in possession, in violation of Title 18 U.S.C. § 922(g); and

**Count 8:**  Charging the defendants with traveling in interstate commerce with intent to commit a crime of violence to further an unlawful activity, namely theft by extortion, contrary to the law of State of New Jersey, in violation of Title 18 U.S.C. § 1952.

## II.  Factual Background

The Indictment is based on a home-invasion robbery that occurred on December 26, 2005, when approximately  4 males

entered a residence located at 7 Annapolis Drive in Erial, New Jersey.  Upon entering the residence, the males, at least two of whom were armed with handguns, forced the occupants of the residence into a second-floor bedroom where the occupants were forced to the floor.  The males physically restrained the occupants by binding their hands and feet with duct tape.  After restraining the occupants, the males stole jewelry, cellular telephones, and other items from the occupants.  The males also demanded the combination to a safe that was located in the residence.  When the occupants were unable to provide the combination to the safe, the males removed it from the residence, placed it in a sport utility vehicle (SUV), and fled.

After the males fled the residence, an occupant of the residence removed the duct tape and fled to a neighbor's house at which point the local police were notified.  The occupant informed the police of the robbery and provided a description of the SUV to the police who broadcast the description to other law enforcement agencies.

Approximately 20 minutes after the description of the SUV had been broadcast, a Gloucester City, New Jersey, police officer observed a vehicle matching the description in the vicinity of the Walt Whitman Bridge.  The vehicle was occupied by 4 males. The officer followed the vehicle over the bridge and attempted to stop the it after the toll plaza.  The vehicle failed to stop and

3

a pursuit ensued.  Philadelphia police joined the pursuit which came to an end when the vehicle crashed into a parked car. Following the crash, the males fled the vehicle.  Three of the males were apprehended following a foot pursuit.  The fourth male was not apprehended.

Two of the males, defendants Brown and Mines, were subsequently identified by occupants of the residence as two of the men who committed the robbery.  The third male, defendant Johnson, who was apprehended hiding under a boat that was parked in a residential area near the scene of the foot pursuit, was positively identified by a police officer as one of the males who fled from the SUV after it crashed.  An occupant of the house described the fourth individual involved in the robbery as an Hispanic male.

During a search of the SUV, police officers recovered a PNC Bank Check Card in the name of William Moreno and a dry cleaning receipt bearing the name "Will Moreno" which was dated December 26, 2005.[1]  The vehicle was not reported stolen by its registered owner, Domingo Hernandez, until 12:45 a.m., on December 27, 2005, approximately 5 hours after the robbery.  At the time Domingo Hernandez reported the vehicle stolen, he informed the police that he parked the vehicle before it was stolen and did not give

---

[1]The government intends to introduce evidence of defendant Hernandez's use of the alias "William Moreno."

4

anyone permission to use it.  Further investigation revealed that an individual named Wanda Moreno is the sister of Domingo Hernandez and defendant William Hernandez.  When interviewed by police on January 6, 2006, Wanda Moreno indicated that *she* was the last person to have possession of the vehicle prior to its alleged theft, and that she had parked it with the keys in the ignition in the 900 block of North 6th Street in Philadelphia on December 26, 2005.

Law enforcement authorities in New Jersey contacted defendant Hernandez's parole officer in Pennsylvania to obtain contact information for Hernandez.  The parole officer provided a cellular telephone number, (267) 257-0177 (hereafter "Hernandez's cellular telephone"), which Hernandez used to contact his parole officer.  Subsequent analysis of the records for Hernandez's cellular telephone revealed a pattern of communications[2] consistent with the time frame of the robbery and the ensuing police chase.

---

[2]For purposes of this memorandum, "communication" is defined as an attempted or completed telephone call, or an attempted or completed communication utilizing the Nextel Direct Connect or "point-to-point" feature, which allows Nextel customers who subscribe to this feature to utilize their cellular telephones as "walkie-talkies" to expedite communications with other Nextel customers.

### III.  The Proffered Evidence

####  A.  Prison records, cellular telephone records, and recorded prison telephone calls.

Following their apprehension in Philadelphia, defendants Brown, Johnson, and Mines were held without bail in the Philadelphia Prison System (hereafter "PPS") pending extradition to New Jersey on charges related to the robbery.  Defendants Brown, Johnson, and Mines were detained in the PPS between December 26, 2005, and on or about February 2, 2006, when they were transferred to federal custody to be processed on the instant charges.

The government has obtained records and telephone recordings from the PPS related to defendants Brown, Johnson, and Mines.  In addition, the government has obtained records and telephone recordings from the Federal Bureau of Prisons (hereafter "BOP") related to the detention of Brown, Johnson, and Mines, following their transfer to federal custody.  The government intends to introduce some of this evidence during the trial in the instant matter.

For example, according to the PPS and/or BOP records, defendant Johnson called 8 different telephone numbers while he was detained between December 26, 2005, and February 23, 2006. Of those 8 telephone numbers, 6 (hereafter "the Johnson numbers") appear in the records for cellular telephone numbers (856) 528-8466 (hereafter "SUV telephone 1") and/or (267) 940-6897

6

(hereafter "SUV telephone 2"), both of which were recovered near the SUV immediately after the police pursuit ended.  In total, there were 69 telephone calls between the Johnson numbers and either SUV telephone 1 or SUV telephone 2 during the time period between December 10, 2005, and December 26, 2005.

Similarly, according to the PPS and/or BOP records, defendant Brown called 14 different telephone numbers while he was detained between December 26, 2005, and February 23, 2006. Of those 14 telephone numbers, 8 (hereafter "the Brown numbers") appear in the records for either SUV telephone 1 or SUV telephone 2.  In total, there were 178 telephone calls between the Brown numbers and either SUV telephone 1 or SUV telephone 2 during the time period between December 10, 2005, and December 26, 2005.[3]

In addition to the PPS telephone records, the government has obtained historical PPS visitation records for defendants Brown, Johnson, and Mines.  Those records appear to reveal that family members for defendants Brown, Johnson, and/or Mines, visited the other defendants while they were detained in the PPS at different times between 1999 and 2005.  For example, an individual named Eric Brown visited defendants Johnson and Mines while they were

---

[3]One of the Brown numbers, (215) 426-4381, also appears in the PPS and/or BOP records relating to the telephone numbers called by defendant Mines while he was detained between December 26, 2005, and February 23, 2006.  In addition, telephone number (215) 291-4516 appears in the PPS records for both defendants Brown and Mines.

detained in the PPS.  Similarly, an individual named Cornelius
Mines visited defendants Brown and Johnson during their detention
in the PPS.  According to the records, Eric Brown and Cornelius
Mines both previously resided at 3432 North Front Street in
Philadelphia.

The government also intends to introduce recorded telephone
conversations involving defendants Brown, Johnson, and Mines
during their PPS and/or BOP detention related to the instant
charges.  The telephone conversations, like the telephone records
described above, further establish the preexisting relationship
among defendants Brown, Johnson, and Mines.[4]

**B.  Records pertaining to defendant Hernandez's cellular
telephone and the cellular telephone bearing telephone
number (856) 491-2284.**

The government intends to introduce records related to
defendant Hernandez's cellular telephone usage before and after
the date of the robbery.  The records in question establish a

---

[4]To the extent necessary, the government intends to
introduce evidence confirming the defendants' use of certain
nicknames on the recorded conversations.  For example, defendant
Johnson identifies himself in the conversations as "Marv."  The
government plans to introduce an arrest photograph of a tattoo of
the name "Marv" on defendant Johnson's arm.

Similarly, the government intends to introduce evidence of
the defendants' use of certain aliases.  For example, defendant
Mines was arrested and charged in October 2001 under the name
"Rasheem Nelson."  Defendant Mines was also arrested and charged
under the name "Rasheen Nelson" in July 2003.  In October 2001,
defendant Johnson, who was incarcerated in the PPS, was visited
by an individual who identified himself as "Rasheen Nelson."

connection between Hernandez and the other defendants as well as
Hernandez's flight from the Philadelphia area within hours of the
end of the police pursuit that followed the robbery.

For example, the records indicate that between December 18,
2005, and December 26, 2005, there were 236 communications
between defendant Hernandez's cellular telephone and either SUV
telephone 1 or SUV telephone 2.  Of those 236 communications, 18
occurred on the day of the robbery.

In addition to the cellular telephones described above, the
government has obtained records for a cellular telephone bearing
telephone number (856) 491-2284 (hereafter "Garcia cellular
telephone").[5]  The records pertaining to the Garcia cellular
telephone establish a connection between it and Hernandez's
cellular telephone, as well as SUV telephone 2.  The records
cover the period leading up to and including the robbery and the
ensuing pursuit.  For example, there were 782 communications
between the Garcia cellular telephone and Hernandez's cellular
telephone between December 11, 2005, and December 26, 2005.  Of
those 782 communications, 108 occurred on the day of the robbery.
With respect to SUV telephone 2, there were 494 communications
between it and the Garcia cellular telephone between December 19,
2005, and December 26, 2005.  Of those 494 communications, 75

---

[5]Telephone number (856) 491-2284 is subscribed to by an
individual named Fernando Garcia.

9

occurred on the day of the robbery.  The cell-site information
for the Garcia cellular telephone indicates that it was in the
same proximity to the scene of the robbery as Hernandez's
cellular telephone as well as SUV telephone 1 and SUV telephone
2.  In addition, the Garcia cellular telephone communicated with
Hernandez's cellular telephone and SUV telephone 2 during the
robbery.[6]

A review of the records pertaining to Hernandez's cellular
telephone has also revealed that defendant Hernandez left the
Philadelphia area, along with his girlfriend, Ashley Kraus,
within hours of the termination of the police pursuit in
Philadelphia.  The police pursuit ended at approximately 8:40
p.m. on December 26, 2005.  Approximately 4 hours later, at 12:55
a.m., on December 27, 2005, the records for Hernansdez's cellular
telephone indicate that the telephone was used in the area of
Norristown, Pennsylvania.  Approximately 4 ½ hours later, at
approximately 5:13 a.m., the telephone was used in the area of

_____

[6]In addition to the telephone records described thus far,
the government intends to introduce the telephone records for the
cellular telephone used by Domingo Hernandez, the registered
owner of the SUV used in the robbery and the brother of defendant
William Hernandez.  The records detail the contact between
defendant Hernandez and Domingo Hernandez following the police
pursuit and the stolen vehicle report filed by Domingo Hernandez
for the SUV used in the robbery.  The records also reflect the
contact involving defendant Hernandez, Domingo Hernandez, and
Wanda Moreno.  As stated previously, Wanda Moreno provided an
inconsistent version of the circumstances under which the SUV was
allegedly stolen.

Harrisburg, Pennsylvania.

Beginning at approximately 11:00 a.m., on December 27, 2005, Hernandez's cellular telephone began to travel in a southwesterly direction.  The telephone continued to travel in that direction for approximately the next 36 hours, before arriving in Texas at approximately 8:30 p.m., on December 28, 2005.  The records further indicate that Hernandez's cellular telephone was used in Texas until approximately January 4, 2006, when Hernandez and Kraus began to drive back to Philadelphia.  Hernandez and Kraus arrived in the Philadelphia area on the evening of January 5, 2006.  In addition to the records pertaining to Hernandez's cellular telephone, the government intends to introduce the records pertaining to Kraus's cellular telephone.  Those records further corroborate Hernandez's departure from the Philadelphia area in the early morning hours of December 27, 2005.  Finally, the government intends to introduce records which indicate that Hernandez and Kraus crossed the U.S./Mexican border in Kraus's automobile on January 3, 2006.[7]

---

[7]In addition to the telephone records described above, the government intends to introduce evidence that defendant Hernandez had telephone number (267) 258-5406 programmed into his cellular telephone.  Telephone number (267) 258-5406 has been subscribed to by an individual named Eric Mines.  The address under which the telephone was subscribed is 3432 North Front Street, Philadelphia, PA 19140.  That address is the same address provided by Cornelius Mines and Eric Brown when Cornelius Mines and Eric Brown visited William Brown, Rasheen Mines, and/or Lawrence Johnson during their incarceration in the PPS between 1999 and 2005.

**C.   Defendant Hernandez's parole status and his initial refusal to provide a DNA sample.**

The government intends to introduce evidence related to defendant Hernandez's parole status during the time period between the fall of 2005 and February 2006 when he was arrested. For example, the government intends to introduce evidence that Hernandez provided his cellular telephone number to his parole agent so that the parole agent could contact Hernandez, and that the parole agent so utilized that telephone number.  In addition, the government intends to introduce evidence that Hernandez's parole agent provided that telephone number to New Jersey law enforcement authorities during the investigation that led to the instant Indictment being returned against Hernandez, as well as the parole agent's efforts to coordinate Hernandez's subsequent arrest.  The government also intends to introduce evidence regarding the seizure of certain items from Hernandez by parole and FBI agents at the time of Hernandez's arrest.  Finally, the government intends to present evidence regarding Hernandez's initial refusal to comply with this Court's Order compelling Hernandez to provide a saliva sample for DNA comparison.

## IV.   Legal Argument

### A.   The evidence involving the defendants' prison records, cellular telephone records, and recorded prison telephone calls is not governed by Fed. R. Evid. 404(b)[8].

The proffered evidence is admissible to demonstrate the preexisting nature of the relationships among the defendants. The jury's understanding of such preexisting relationships is crucial to its evaluation of the government's evidence regarding the identity of the defendants as the perpetrators of the charges set forth in the Indictment.   Evidence that demonstrates such preexisting relationships among the defendants is therefore intrinsic to the charges and thus admissible in this trial notwithstanding the limitations created by Fed. R. Evid. 404(b) on the admission of evidence of "other crimes or acts."

Rule 404(b) "does not extend to evidence of acts which are 'intrinsic' to the charged offense." United States v. Cross, 308 F.3d 308, 320 (3rd Cir. 2002), quoting Fed. R. Evid. 404(b),

---

[8]Rule 404(b) provides:

> Evidence of other crimes, wrongs, and acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Advisory Committee Note, citing United States v. Williams, 900
F.2d 823 (5th Cir. 1990); accord, United States v. Carter, 401
F.2d 748, 749 (3d Cir. 1968).  As stated in the Advisory
Committee's Notes to Fed. R. Evid. 401, "evidence which is
essentially background in nature . . . is universally offered and
admitted as an aid to understanding."  Such evidence is intrinsic
if "evidence of the other act and the evidence of the crime
charged are 'inextricably intertwined' or . . . the other acts
were 'necessary preliminaries' to the crimes charged."  Williams,
900 F.2d at 825;[9] United States v. Powers, 168 F.3d 741, 749 (5th
Cir. 1999); United States v. Viefhaus, 168 F.3d 392, 397 (10th
Cir. 1999); and see United States v. Devillio, 983 F.2d 1185 (2d
Cir. 1993) (other crimes evidence necessary to complete the story
of the charged offenses and show the relationship among the co-
conspirators); United States v. Liefer, 778 F.2d 1236, 1252 (7th
Cir. 1985) (evidence admissible to show how conspiracy developed
and why defendants trusted one another).  Intrinsic evidence is
admissible notwithstanding the dictates of Rule 404(b) because
the jury must be permitted to "view and consider the entire
circumstances surrounding an alleged offense," United States v.

---

[9]As one former member of this Court concluded, the Third
Circuit has apparently  endorsed the Williams definition of
intrinsic evidence in United States v. Blyden, 964 F.2d 1375,
1378 (3d Cir. 1992).  United States v. Butch, 48 F.Supp.2d 453,
458 (D.N.J., 1999) (Orlofsky, J.), aff'd, 256 F.3d 171 (3d Cir.
2001).

Smith, 930 F.2d 1081, 1087 (5th Cir. 1991), so that it "may evaluate all of the circumstances under which the defendant acted." United States v. Navarro, 169 F.3d 228, 233 (5th Cir. 1999).

In the present case, the proffered evidence involving the defendants' prison records, cellular telephone records, and recorded prison telephone calls is admissible to complete the story of the crime and explain the relationship of the parties. United States v. Barth, 219 F.R.D. 153, 155 (D.N.D. 2003), quoting United States v. Edwards, 159 F.3d 1117, 1129 (8th Cir. 1998); see also United States v. Champion, 813 F.2d 1154, 1172-73 (11th Cir. 1987) (evidence relating to defendant's incarceration and time in halfway house properly admitted to make crime comprehensible to jury) (citations omitted); United States v. Ortiz, 182 F.Supp.2d 443, 448 (E.D.Pa. 2000) (evidence of uncharged conduct involving the defendant's interaction with other members of the charged drug-trafficking organization was relevant to prove the defendant's relationship to the drug distribution organization).

Moreover, the proffered evidence is intrinsic even if it involves conduct that occurred before the commencement of the charged crimes.  United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994) ("the mere fact that the evidence involved activities occurring before the charged time frame of the conspiracy does

15

not automatically transform that evidence into 'other crimes'
evidence"). Nor does the timing of the recorded prison telephone
calls otherwise impede the admission of evidence of those
conversations. United States v. Bagaric, 706 F.2d 42, 65 (2d
Cir. 1983) ("There is no requirement that all the Government's
evidence fall within the time period of the Indictment, providing
it is relevant to the charges."), *abrogated on other grounds*,
National Organization for Women, Inc. v. Scheidler, 510 U.S. 249,
260 (1994); see generally United States v. Baskes, 649 F.2d 471,
480 (7th Cir. 1980) ("the fact that evidence is offered of events
which occurred prior or subsequent to those charged in the
Indictment does not make the evidence objectionable."). Indeed,
"evidence introduced to prove [an illegal] scheme may go back to
the beginnings of the scheme and even before it was fully
formed." United States v. Nelson, 570 F.2d 258, 262 (8th Cir.
1978). Accordingly, evidence regarding the prison records,
cellular telephone records, and recorded prison telephone calls
identified above should be admitted as intrinsic to the charges
against the defendants without resort to analysis under Rule
404(b).

In any event, the prison records, cellular telephone
records, and recorded prison telephone calls are admissible under
Rule 404(b). In United States v. Huddleston, 108 S.Ct. 1496,
1502 (1988), the Supreme Court set forth the following guidelines

16

for admission of extrinsic evidence governed by Rule 404(b):

1.    The evidence must be offered for a proper purpose,
      i.e., not one prohibited by Rule 404(b);

2.    The evidence must be relevant under Rule 402;

3.    The probative value of the evidence must not be
      substantially outweighed by the potential for
      unfair prejudice under Rule 403; and

4.    The trial court must give limiting instructions
      under Rule 105 if requested.

The Third Circuit has given broad scope to these guidelines.
As the Court of Appeals stated recently, "[i]n general, we favor
the admission of Rule 404(b) evidence when it is relevant for any
other purpose than to show the defendant's propensity to commit
the charged offense." United States v. Daraio, 2006 WL 903183
(3d Cir. 2006), citing  United States v. Givan, 320 F.3d 452, 460
(3d Cir. 2003); United States v. Long, 574 F.2d 761, 764 (3d
Cir.), cert. denied, 439 U.S. 985 (1978).  In Long, the Court
stated that the drafters of Rule 404(b) "intended to emphasize
admissibility of other crime evidence." Id. at 766.  In this
connection, the Third Circuit has long held that Rule 404(b) is a
rule of inclusion and not of exclusion.  See, e.g., Government Of
Virgin Islands v. Harris, 938 F.2d 410, 419 (3d Cir. 1991);
United States v. Pungitore, 910 F.2d 1084, 1149-50 (3d Cir.
1990), cert. denied, 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98
(1991); United States v. Scarfo, 850 F.2d 1015, 1019 (3d Cir.
1988), cert. denied, 488 U.S. 910 (1988); United States v.

17

Simmons, 679 F.2d 1042, 1050 (3d Cir. 1982), cert. denied, 462
U.S. 1134 (1983).

The proffered evidence clearly satisfies the first two
Huddleston criteria of relevance and a proper evidentiary
purpose.  All relevant evidence is admissible, see Fed. R. Evid.
402, and relevant evidence is:

> evidence having any tendency to make the existence of
> any fact that is of consequence to the determination of
> the action more probable or less probable than it would
> be without the evidence.

Fed. R. Evid. 401.

In order to "show a proper evidentiary purpose, the
government must 'clearly articulate how that evidence fits into a
chain of logical inferences' without adverting to a mere
propensity to commit crime now based on the commission of crime
then." United States v. Mastrangelo, 172 F.3d 288, 295 (3d Cir.
1999), quoting United States v. Sampson, 980 F.2d 883, 886 (3d
Cir. 1992).  The government's burden "is not onerous.  All that
is needed is some showing of a proper relevance." Sampson, 980
F.3d at 888 (emphasis in original).

Here, the proffered evidence is not offered to prove the
defendants' character or their propensity to engage in illegal
conduct.  To the contrary, the evidence is offered for the proper
purposes of explaining and demonstrating the preexisting
relationship involving the defendants, thereby corroborating the
government's evidence regarding the identity of the individuals

18

involved in the robbery.  It is anticipated that the defendants will argue that the victims and police officers mistakenly identified the defendants regarding their involvement in the crimes charged in the Indictment.  The evidence will irrefutably demonstrate a preexisting relationship and thus will highlight the significant improbability that the defendants were each the subject of misidentification.  For example, in light of the proffered evidence, any defense claim that defendants Brown, Johnson, and Mines were mistakenly identified is fatally undermined when viewed in the context of the fact that those three defendants were arrested and positively identified by police officers in close proximity to each other following the end of the police pursuit.

The proffered evidence of the recorded conversations should not be excluded by operation of Federal Rule of Evidence 403, which provides:

> Although relevant, evidence may be excluded if its probative value is <u>substantially outweighed</u> by the danger of <u>unfair</u> prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403 (emphasis added).  <u>See</u> <u>Cross</u>, 308 F.3d at 324 (relevant evidence can be excluded under Rule 403 only if its prejudicial effect "substantially" outweighs its probative character); <u>Johnson</u>, 199 F.3d at 128 ("In weighing the probative value of evidence against the dangers in Rule 403, the general

19

rule is that the balance should be struck in favor of admission.") (internal punctuation omitted).  Given the government's strenuous burden of proof in a criminal case, in particular establishing the identity of the defendants as the individuals who committed the charged offenses, evidence that supports the reliability of the government's other evidence is highly probative.  This is particularly true where, as here, it is anticipated that the defense will vigorously attack the government's evidence of identification.  See United States v. Henthorn, 815 F.2d 304, 308 (5th Cir. 1987).

"Unfair prejudice within [the context of Rule 403] means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one."  Cross, 308 F.3d at 324, n.23, quoting Fed. R. Evid. 403, Advisory Committee Notes.  Here, the proffered evidence will be presented only to demonstrate the preexisting relationships among the defendants, and thus will corroborate the reliability of the government's other evidence.  As such, the evidence will not elicit an improper emotional reaction from the jury.  Such evidence, therefore, should not be excluded under Rule 403.

Finally, this Court can effectively instruct the jury to consider the proffered evidence only for the limited purpose for which it is offered, i.e., as proof of the preexisting relationship among the defendants and thus the identity of the

defendants as the individuals who committed the crimes charged in the Indictment.  See United States v. Cruz, 326 F.3d 392, 396-97 (3rd Cir. 2003) (district court met fourth Huddleston requirement by carefully providing jury with limiting instructions regarding the limited purpose for which defendant's parole status at time of crime was offered).

**B.  The records pertaining to defendant Hernandez's cellular telephone and the Garcia cellular telephone are not governed by Rule 404(b).**

As with the cellular telephone records pertaining to SUV telephone 1 and SUV telephone 2, the records which establish a connection between those telephones and either Hernandez's cellular telephone or the Garcia cellular telephone are admissible to demonstrate the relationships among the defendants before, during, and after the robbery, and thus are not governed by the limitations of Rule 404(b).  See United States v. Williams, supra;  United States v. Devillio, supra; and United States v. Smith, supra.

For example, as stated above, there were hundreds of communications between Hernandez's cellular telephone and the Garcia cellular telephone in the 15-day period leading up to and including the day of the robbery.  In addition, the records establish a pattern of communication between and among SUV telephone 1, SUV telephone 2, and the Garcia cellular telephone during the period leading up to and including the robbery.  As

21

such, the various telephone records, when viewed in the context of the PPS and/or BOP records, conclusively establish an ongoing relationship between and among the defendants that predated the robbery.

Even if Rule 404(b) applied to Hernandez's cellular telephone records and/or the records pertaining to the Garcia cellular telephone, those records would nonetheless be admissible.  Under Huddleston, the records are clearly being offered for a non-propensity purpose, i.e., to prove the defendants' identity as the perpetrators of the robbery.  In addition, the records are clearly relevant to determining the issue of identity insofar as the records directly link the various cellular telephones that were used in furtherance of the robbery and during the time frame during which the robbery occurred.  Moreover, to the extent the records establish that Hernandez fled after the robbery, such evidence is admissible as consciousness of guilt.[10]  As such, the evidence is relevant under Fed. R. Evid. 401.  Finally, the probative value of the proffered evidence is not substantially outweighed by any unfair

---

[10]The Third Circuit has held that "'[e]vidence of a defendant's flight after a crime has been committed is admissible to prove his consciousness of guilt.'" United States v. Green, 25 F.3d 206, 210 (3d Cir. 1994), quoting United States v. Pungitore, 910 F.2d at 1151; see also, United States v. Bartelho, 129 F.3d 663 (1st Cir. 1997) ("[e]vidence of flight or escape may be admissible to prove a defendant's consciousness of guilt, consistent with Rule 404(b).") (citations omitted).

prejudice resulting from the introduction of the evidence and, as with the other cellular telephone records, this Court can effectively instruct the jury of the limited purpose for which the evidence is offered.  <u>See</u> <u>United States v. Cross</u>, <u>supra</u>; and <u>United States v. Cruz</u>, <u>supra</u>.

> **C.  Defendant Hernandez's parole status and his initial refusal to provide a DNA sample are admissible under Rule 404(b).**

At the time of the robbery, defendant Hernandez was on parole in Pennsylvania.  During the investigation which led to the instant Indictment against Hernandez, law enforcement authorities obtained Hernandez's cellular telephone number from his parole agent.  The acquisition of that number, in turn, led to the discovery of much of the evidence described thus far.  The government intends to call the parole agent to testify about his contact with Hernandez and the circumstances that led to his arrest.

In <u>United States v. Cruz</u>, <u>supra</u>, the Third Circuit was confronted with a similar issue.  There, the government sought to introduce evidence regarding the defendant's parole status during the drug conspiracy charged in the indictment.  Specifically, the government offered the defendant's parole status as proof of his "motive, intent and method of concealing his illegal drug activity in order to avoid the risk of parole revocation." <u>Cruz</u>, 326 F.3d at 395 (citation omitted).  After applying the four-part

test set forth in Huddleston, the Third Circuit held that the district court did not err in admitting the evidence related to Cruz's parole status.

Similarly, the government in the present case is offering evidence of defendant Hernandez's parole status for a proper, non-propensity purpose, i.e., identity, under Rule 404(b).  As such, the evidence is clearly relevant under Rule 401, insofar as the records pertaining to Hernandez's cellular telephone, and the recovery of that telephone from him when he was arrested, are directly linked to his parole status and the proffered testimony of his parole agent.  Like the defendant in Cruz, Hernandez cannot claim that the probative value of his parole status, and the evidence subsequently obtained, is substantially outweighed by the danger of unfair prejudice.  Any potential prejudice can be effectively neutralized by a proper, limiting instruction.  As the Cruz court noted, "the district court met the fourth [Huddleston] requirement for admission of Rule 404(b) evidence by carefully providing the jury with limiting instructions both immediately after [the parole officer's] testimony and also during the jury charge."  Id. at 396 (footnotes omitted).  Such an instruction can be provided by this Court, thereby satisfying the requirements of Huddleston.

In addition to defendant Hernandez's parole status, his initial refusal to provide a sample of his saliva for DNA

24

comparison is admissible under Rule 404(b) as consciousness of guilt.[11]  On March 29, 2006, this Court granted the government's motion to compel defendants Brown, Hernandez, and Mines to provide saliva samples for DNA comparison over the objection of counsel for Hernandez.  Despite this Court's lawful Order, Hernandez refused to provide the saliva sample to the FBI agent who attempted to obtain it from Hernandez.  The prospect of a contempt finding by this Court and the forcible acquisition of a blood sample eventually convinced Hernandez to comply with this Court's order.  Nonetheless, Hernandez's initial refusal to comply with this Court's valid order is evidence of his consciousness of guilt and the government intends to introduce evidence in support of that argument at trial.  See United States v. Franklin, 2000 WL 217527 (E.D.Pa. 2000) (detailing defendant's refusal to provide blood sample for DNA comparison and consideration of that refusal by jury as consciousness of guilt), aff'd, 248 F.3d 1141 (3d Cir. 2000); see also, United States v. Brazel, 102 F.3d 1120, 1152-53 (11th Cir.) (affirming jury instruction that defendant's refusal to provide handwriting

---

[11]Hernandez's initial refusal to comply with this Court's Order is not surprising given the preliminary DNA results.  The government has been informed by FBI forensic examiners that Hernandez's DNA positively matches the DNA found on a hat and a mask recovered from the SUV after the robbery and ensuing police pursuit.  Not only does the recovered DNA positively match Hernandez's DNA, the statistical probability that it could have come from another source is so insignificant that the forensic examiner will testify that Hernandez is, in fact, the source of the DNA recovered from the items in question.

exemplar could be considered as evidence of consciousness of guilt), <u>cert. denied</u>, 522 U.S. 822 (1997); <u>United States v. Jackson</u>, 886 F.2d 838, 848 (7th Cir. 1989) (reversing district court for excluding defendant's refusal to provide handwriting exemplar as consciousness of guilt); <u>United States v. Askew</u>, 584 F.2d 960, 963 (10th Cir. 1978) (holding that it was proper for government to comment on defendant's refusal to provide handwriting exemplar as indication of guilt), <u>cert. denied</u>, 439 U.S. 1132 (1979).

<b><u>CONCLUSION</u></b>

For all of the foregoing reasons, this Court should grant the government's motion, and admit the proffered evidence.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
United States Attorney


/s/ STEVEN D'AGUANNO
By:  STEVEN D'AGUANNO
     Assistant United States Attorney


Dated:  May 3, 2006